IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DON A. FARR,

       Plaintiff,

v.                                CIV 04-1272 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

# MEMORANDUM OPINION AND ORDER

## I.  Background

Plaintiff Don A. Farr[1] worked at various jobs, most recently doing courier and apartment maintenance work.  He quit working at age thirty-two in April 2000, due to a lower back injury that he incurred while carrying someone.  He also had a history of several chronic conditions including hypertension, gastroesophageal reflux disease, obesity, adult-onset diabetes, and hypertriglyceridemia.  Despite medications and dietary restrictions, all of these conditions were at that time "suboptimally" controlled either due to noncompliance with medications and diet, and/or his obesity.  Plaintiff first filed for benefits in Texas right after he quit working, but he did not pursue that matter after the initial denial.  After undergoing his first back surgery in early 2002, he filed a second application for benefits while residing in Ohio.  After undergoing a second back surgery in late 2002, he moved to New Mexico and his claim proceeded to the hearing level.

---

[1]  Plaintiff is referred to as "Donald" in some of the pleadings, but the Complaint and medical records primarily refer to him as "Don."

*E.g., Administrative Record* ("*Record*") at 14, 41-42, 44-45, 105, 112, 113, 122, 126, 143, 332, 325-27.

After two hearings and considerable supplementation of the record, Administrative Law Judge ("ALJ") Gerald R. Cole secured testimony from a vocational expert and denied benefits at Step 5.  He found that Plaintiff has the residual functional capacity to perform "at least sedentary work" in jobs that allow a sit or stand option and do not require more than "occasional" climbing, stooping, kneeling, and crawling.  *Id.* at 19.  The ALJ  specifically identified three out of a number of jobs that Plaintiff can perform – procurement clerk, telephone solicitor, and eyeglass assembler. *Id.* at 20.  The Appeals Council declined review on September 22, 2004, thereby rendering the ALJ's decision final.  *Id.* at 5-6.

The crux of this case involves four of Plaintiff's conditions – obesity, two lower back surgeries in 2002, diabetic neuropathy, and depression.  In Plaintiff's motion to reverse or remand, he asserts that the ALJ committed four categories of error and raises numerous, sometimes confusing, arguments throughout these categories.  *See Docs. 8, 9.*  In some areas, his arguments are best understood by reference to his reply.  *See Doc. 11.*

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief.  *E.g., Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).[2]  My assessment is based on a

_____

[2]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214; *Doyal,* 331 F.3d at 760.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also*

"meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *Hamlin,* 365 F.3d at 1214; *see also Langley,* 373 F.3d at 1118.

ALJ Cole issued a particularly thorough opinion that accurately reflects the record. *See id.* at 13-22. The parties' briefs also provide ample discussion of the medical evidence. Therefore, I will only discuss relevant facts in the analysis sections below. Having carefully considered the entire record and the parties' arguments, I find Plaintiff's arguments to be unavailing, and will affirm the decision of the Commissioner.[3]

## II. Analysis

### A. Indigency

ALJ Cole continued his first hearing in order to supplement the record. He also was going to "attempt to get [Plaintiff's] prior file," but it is unclear whether he succeeded. *Record* at 49. Thereafter, counsel supplemented the record several times with current records. *See, e.g, id.* at 291, 308, 317, 339, 340, 321, 353-54. Counsel does not suggest that the record before me is incomplete or that there are existing, but missing, records.

As ALJ Cole noted throughout his opinion and as the Record reveals, Plaintiff was not particularly compliant with his medications, he has self-medicated with considerable amounts of alcohol, and in some instances there are no medical records despite Plaintiff's assertion that he was seeking treatment and/or had a serious condition. In challenging the ALJ's credibility finding,

---

*Hamlin,* 365 F.3d at 1214.

[3] Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment. *See Docs. 3, 5.*

Plaintiff asserts that he "was indigent and should not be expected to have medical treatment with the same availability as a person with decent health insurance." *Doc. 9* at 19.

Yet, there is no evidence that Plaintiff sought low-cost treatment or was denied treatment because of his financial situation, and his claim of indigency appears to be related to a discrete time frame -- November 2002 through November 2003. *See id.* at 18-19. As discussed below, however, he did in fact receive medical treatment during the latter part of that period. Finally, his claim of indigency is inconsistent with his practice of spending money to buy alcohol. Therefore, I find that the lack of medical documentation is not due to an incomplete record or indigency, and reject this asserted basis for error.[4]

### B.  ALJ Cole Did Not Err In Finding Depression Nonsevere

At Step 2 of the sequential analysis, the claimant bears the burden of showing, **by medical factors alone,** that his or her alleged mental impairment "significantly limits" a "basic work activity."[5] If the claimant does not meet that showing, the ALJ can deny benefits for the asserted

---

[4]  *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (claimant cannot blame failure to pursue treatment on inability to afford where there is no evidence claimant sought low-cost treatment or was denied medical treatment because of financial condition); *see also Sias v. Sec'y of Health and Human Servs.,* 861 F.2d 475, 477 (6th Cir. 1988) (despite life-threatening condition, claimant would not wear support hose prescribed by physician because of cost, yet he "found it possible to buy two packs of cigarettes a day. . . ."); *Bates v. Barnhart,* 222 F. Supp. 2d 1252, 1261 (D. Kan. 2002) ("He states that he cannot afford treatment or medication, yet the ALJ explored his financial resources and found that he had several assets at his disposal.  The record supports a finding that Plaintiff's testimony regarding his assets and his smoking habit is inconsistent with his claim that he cannot afford medical treatment."); *McKenney v. Apfel,* 38 F. Supp. 2d 1249, 1256 (D. Kan. 1999) (claimant did not fill prescriptions citing lack of funds but "[t]here is no indication McKenney ever tried to apply for aid in order to obtain these prescriptions."); *Jacobs v. Chater,* 956 F. Supp. 1560, 1567-68 (D. Colo.1997) ("inability to pay for treatment does not necessarily preclude an ALJ from considering the failure to seek medical attention in credibility determinations, especially where the claimant could apparently afford beer and cigarettes.").

[5]  The regulations define "basic work activities" as to mental impairments as:  "Understanding, carrying out, and remembering simple instructions;" "Use of judgment;" "Responding appropriately to supervision, co-workers and usual work situations;" and "Dealing with changes in a routine work setting."

condition without continuing on to the next steps of the analysis.  *E.g., Langley,* 373 F.3d at

1123; *Williamson v. Barnhart,* 350 F.3d 1097, 1099-1100 (10th Cir. 2003); *Eden v. Barnhart,*

109 Fed. Appx. 311, 313-14 (10th Cir. 2004); *Cainglit v. Barnhart,* 85 Fed. Appx. 71, 73 (10th

Cir. 2003); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1520a(d)(1), 404.1521(a).

        ALJ Cole made detailed findings in concluding that Plaintiff's anxiety and depression were

not "severe."   Those findings provide in full:

> At times during these proccedings (sic), Mr. Farr has also alleged
> that he is affected in his ability to perform mental work activities by
> depression.  In May 2002 [after his first back surgery], when Mr.
> Farr was evaluated for the pain management program, he
> underwent a psychological evaluation.  The diagnoses were pain
> disorder, due to both psychological factors and his general medical
> condition; major depressive episode, single, moderate; and
> generalized anxiety disorder.  At that time, he was thought to be
> functioning with a Global Assessment of Functioning (GAF) Scale
> score of 54, indicating only moderate symptoms and moderate
> difficulty functioning.  Diagnostic and Statistical Manual of Mental
> Disorders (American Psychiatric Press, 4th ed. 1994) (DSM-IV), p.
> 32.  (Ex. 1F at 49-50)  Although he did not have specialized mental
> health care until late 2003, Mr. Farr has been taking antidepressant
> medications, prescribed by his medical doctors, throughout the
> period under review.  In December 2002, a psychologist evaluated
> Mr. Farr at the request of the Commissioner, in connection with
> these proceedings.  (Ex. 6F)  The consultative psychologist
> reported no significant psychological signs or symptoms.
> Specifically, he found no evidence of the memory problems Mr.
> Farr has described. (Ex. 6F at 5)  The consultative psychologist did
> not find evidence to support a psychological diagnosis and he
> determined that Mr. Farr was functioning with a GAF score of 55.
> (Ex. 1F at 49-50).  See DSM-IV at 32.  This evidence does not
> support a finding that Mr. Farr has mental impairment that can be
> considered "severe" within the meaning of the Act and Regulations.
> (See Ex. 7F)  See 20 CFR § 404.1521.  In November 2003, Mr.
> Farr reported that he had attempted suicide by overdosing a little
> over two months before (Ex. 6E at 1); but he has produced no

---

20 C.F.R. § 404.1521(b)(3)-(6).

records from that event.  (See Ex. 9F at 3-4)  In December 2003,
he told a consultative physician that he was seeing a psychiatrist
(Ex. 10F at 8); but he has neither identified a treating psychiatrist
nor produced any progress notes or treatment records relating to
mental health treatment.  He has identified Counseling Associates
as a source for ongoing mental health care, in November 2003 (Ex.
6E at 1) and again in April 2004 (Ex. 7E at 1); but he has not
produced any treatment records from this source.  In contrast, in
January 2004, Mr. Farr gave a *history* of depression in 1998, prior
to his alleged onset date.  Based on this record, Mr. Farr has failed
to establish the existence of a medically determinable, "severe"
mental impairment.  (See Ex. 7F)  20 CFR § 404.1520a.

*Record* at 17; *see also id.* at 18 (ALJ note that "there is insufficient evidence in the record to

support a finding" of "severe" depression); *id.* at 273-88 (unidentified DDS physician PRT form

finding mental impairment not severe and resulting in no or minimal functional limitations).

　　　　Plaintiff asserts that his GAF scores, coupled with his testimony during the hearing that he

has memory problems he attributes to depression, satisfy the *"de minimis"* showing required of

him at Step 2.  *See Doc. 9* at 10-12.  However, GAF scores greater than 50 do not conclusively

establish the requisite severity at Step 2,[6] nor does subjective testimony.[7]  More importantly, GAF

scores can indicate problems entirely unrelated to the ability to hold a job.[8]

---

[6]  *See Lee v. Barnhart,* 117 Fed. Appx. 674 678 (10th Cir. 2004) ("Standing alone, a low GAF
score [of 48] does not necessarily evidence an impairment seriously interfering with a claimant's ability to
work . . .   A GAF score of fifty or less, however, does suggest an inability to keep a job. . . .  In a case like
this one, decided at step two, the GAF score should not have been ignored."); *see also Langley,* 373 F.3d at
1123 ("GAF score [of] 50, indicat[es] serious symptoms.").

[7]  *E.g., Moore v. Barnhart,* 114 Fed. Appx. 983, 990 (10th Cir. 2004) ("Plaintiff's reference to
other statements she made . . . likewise do not establish a significant mental impairment of disabling
proportions.").

[8]  *E.g., Zachary v. Barnhart,* 94 Fed. Appx. 817, 819 (10th Cir. 2004) ("A GAF of 45 indicates
'[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning.'
AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th
ed. 2000).  Dr. Mynatt's finding that Ms. Zachary's present level of functioning was 45 did not include any
explanation for giving her that rating and did not indicate that Ms. Zachary was unable to work.  Ms.

Both of the GAF assessments were conducted shortly after his two surgeries, yet neither his treating sources nor the consulting psychologist found that depression affected any of Plaintiff's basic work activities, much less the memory problems he alleges.  To the contrary, his treating sources reported that Plaintiff's "mental function appeared to be good for memory and orientation," *Record* at 165, and that the Prozac and Amitriptyline were providing "benefit," *id.* at 150.  The consulting psychologist found Plaintiff had no agitation or restlessness, his attention and concentration were good, and he could follow instructions, deal with stress and relate to others, *id.* at 269, 271.  These objective medical findings contradict Plaintiff's testimony that his memory is impaired due to depression.

All of Plaintiff's medical records for the four-year period from 2000 to 2004 have been thoroughly reviewed and evaluated .  Save for the psychological assessment by his treating sources after the first surgery, the rest of the medical records from Plaintiff's treating sources are devoid of complaints of depression, referrals for psychiatric treatment, or any limitations due to depression.  Simply having a prescription for and taking antidepressants does not establish Step 2

---

Zachary's GAF score of 45 may indicate problems not necessarily related to her ability to hold a job, *see id.,* and therefore standing alone, without any further narrative explanation, this rating does not support an impairment seriously interfering with her ability to work."); *Cainglit,* 85 Fed. Appx. at 75 ("A GAF score of 41-50 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning,' while a GAF score of 31-40 indicates '[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood.' . . .  A GAF score of 39-45 thus may indicate problems that do not necessarily relate to one's ability to work. . . .  In this case neither Dr. Ball nor the MHSSO counselors stated that Ms. Cainglit's depression would interfere with her ability to work. . . .  Rather, they noted problems with her family and social relationships. . . .  In the absence of any evidence indicating that Dr. Ball or the MHSSO assigned these GAF scores because they perceived an impairment in Ms. Cainglit's ability to work, the scores, standing alone, do not establish an impairment seriously interfering with Ms. Cainglit's ability to perform basic work activities.").

severity in the basic activities,[9] and the mere presence of a depressive condition will not satisfy Plaintiff's burden at Step 2.[10]   For all these reasons, I find that ALJ Cole's Step 2 decision applied the correct standards and is supported by substantial evidence.

### C.  *"Combination" Argument*

Plaintiff's contentions regarding "combination" and "equivalency" are a bit confusing.  As I understand it, Plaintiff is not raising the argument that ALJ Cole failed to consider the combination of Plaintiff's impairments in his ***Step 2*** analysis.  Rather, Plaintiff is raising the arguments with regard to the later steps.  *See Doc. 9* at 9-13, 18-19; *see also Doc. 11* at 4 (title to section III indicates combination argument is directed toward Step 3 and Step 4 analysis).

If, however, Plaintiff is asserting that ALJ Cole failed to consider the combined effect of his impairments at Step 2, *see Doc. 9* at 9-10; 12-13, then I find the argument plainly meritless. ALJ Cole thoroughly examined the medical evidence of all of Plaintiff's conditions at Step 2.  *See Record* at 15-18, 21.  Moreover, he considered "the combined impact of all" of Plaintiff's alleged impairments at Step 4, "both severe and non-severe."  *Id.* at 18.  Since there is no evidence supporting Plaintiff's assertion that his depression causes any memory or other limitations, it would have no impact on the Step 4 analysis.  I thus find no error.[11]

---

[9]   *See Hawkins v. Chater,* 113 F.3d 1162, 1164-65 (10th Cir. 1997) (Claimant's treating physicians prescribed antidepressants but no objective medical evidence supported that diagnosis; report of consulting examining source finding claimant did not suffer from a severe mental impairment, "coupled with the absence of any objective medical findings regarding claimant's alleged depression, justifies the ALJ's decision to discredit claimant's testimony and the fact of her use of prescribed anti-depressants.").

[10]   *E.g., Williamson,* 350 F.3d at 1100; *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir. 1997); *Bernal v. Bowen,* 851 F.2d 297, 301 (10th Cir. 1988).

[11]         If an ALJ does not rule out an impairment as severe at Step 2 and goes on to consider it in the residual functional capacity analysis, there is no error. *E.g., Gonzales v. Secretary of Health & Human Servs.,* 1994 WL 413310

### D.  ALJ Cole Did Not Err In Finding Listing 1.04(a) Is Not Met At Step 3

Plaintiff's arguments concerning Step 3 are based on Listing 1.04(a), which addresses "disorders of the spine."[12]   To be determined disabled at Step 3, medical evidence alone must establish a condition that meets Listings-level severity for the requisite one-year duration.  *E.g.,* 20 C.F.R. §§ 404.1525(a), (c).  Farr asserts that he met both the durational requirement and the Listing.

---

> at *1 (10th Cir. 1994) (affirming decision of this Court where ALJ did not rule out mental impairment at Step 2 and went on to consider the condition at issue in Step 4 analysis); *Grant v. SSA,* CIV 02-1166 KBM (*Doc. 17* at 5-6 & n.2; ALJ failure to mention condition at Step 2 held harmless where ALJ considered the condition in Step 4 analysis).

*Trujillo v. Barnhart,* CIV 04-321 KBM (Doc. 15 at 20).

> [12]     1.04  *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain*,* limitation of motion of the spine*,* motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2003).

> As I held in a prior opinion, Listing 1.04(a) requires a showing of five things:
>
> (1) a condition such as degenerative disc disease or spinal stenosis;
> (2) the condition results in compromise of a nerve root or the spinal cord;
> (3) nerve root compression characterized by neuro-anatomic distribution of pain;
> (4) nerve root compression characterized by limitation of motion of the spine; and
> (5) nerve root compression characterized by either atrophy or muscle weakness, also accompanied by sensory or reflex loss; if the condition involves the lower back, the atrophy or weakness accompanied by sensory or reflex loss must be reflected in a "positive" straight-leg raising test.

*Hardesty v. Barnhart,* CIV 03-1114 KBM (*Doc. 15* at 11).

9

### 1. Duration

Plaintiff contends ALJ Cole failed to consider a "closed period of disability."  *See Doc. 9* at 9; *Doc. 11* at 4.  Contrary to Plaintiff's assertion, however, ALJ Cole **did** consider whether Plaintiff met the durational requirement.  In his detailed discussion of the medical and testamentary evidence, ALJ Cole made these findings:

> Mr. Farr has reported that he injured his back in May 1999.  (See Exh. 1F at 12) He began to report problems with back and leg pain starting in March 2000, a few weeks before he stopped working. (Ex. 1E at 2)  However, Mr. Farr did not seek regular, ongoing medical attention for these symptoms for more than a year after he stopped working.  ***In December 2001, magnetic resonance imaging (MRI)*** . . . revealed that Mr. Farr had a small to moderate disc herniation at L5-S1, which was impinging on a nerve root. (Ex. 1F at 3).

> \* \* \* \* \*

> . . . the case file reveals that Mr. Farr recovered after the second back surgery in November 2002.  Mr. Farr has made scattered complaints to his primary care physician since that time (see Exs. 9F at 3 and 17; and 10F at 304 and 7-9), but the medical record reveals no significant medical treatment for back problems after November 2002.  (See Ex. 6F at 4) ***From the time Mr. Farr made a concerted effort to obtain relief from his back and leg pain, in December 200[1], to the date he last required medical attention for his back problems, November 2002, less than 12 months had elapsed.  See 20 CFR § 404.1509.***  Since then, although Mr. Farr's back condition has had some effect on his ability to perform such activities as walking and standing, these problems have not prevented him from performing any work at all.

*Record* at 15 (emphasis added).

Plaintiff further contends that he met Listing 1.04(a) for "at least" a year -- a period that he dates as "several months" before his February 2002 surgery through the November 2002 surgery.  *See Doc. 9* at 9; *Doc. 11* at 4.  I disagree.  ALJ Cole's conclusion that December 2001

and November 2002 mark the first and last dates of objective medical evidence of a potentially

Listings-level condition is supported by substantial evidence.

Although there is some discrepancy about when Plaintiff hurt his back,[13] the only objective

medical evidence of stenosis with compression occurred in December 2001.  Plaintiff's medical

records begin in March 2000 from Texas sources and show three doctor visits for his back over a

one-month period – in the interim, Plaintiff quit working.[14]  For his back pain, Plaintiff was to see

an orthopedist and begin physical therapy.  *Record* at 329.  However, there are no other medical

records until a year later, just after Plaintiff filed his first application.  *See e.g., id.* at 14, 122, 323;

*see also Doc. 9* at 1.

In April 2001, Plaintiff reported that he had been out of medication for a year and a half,

---

[13]  Plaintiff claims that he hurt his back when he was carrying his sister-in-law and heard his back "pop," but his report of when this event occurred is contradictory.  For example, on March 23, 2000, he told medical personnel that it occurred in the early March 2000.  *See Record* at 330 ("c/o 2 week Hx of LBP after lifting his sister-in-law and heard a pop.").  A year later, he related the same timeframe.  *See id.* at 326 (April 24, 2001 medical record states "about a year ago his sister in law fainted [in] the shower – carried her back to the bedroom.  Hurt his back"); *see also id.* at 177 (August 18, 2001 medical record states Plaintiff injured his back carrying "sister-in-law from shower to living room x 1 ½ years ago"). Eight months later, however, he told his surgeon that he hurt his back in May 1999, had been off work since then for over two years, and had undergone physical therapy in late 1999 without success.  *See id.* at 157, 238; *but see also, e.g., id.* at 111 (income for 1999 was $12,130.57 and for 2000 was $2,361.64); *id.* at 113 (onset of back injury was March 14, 2000 and caused him to stop working on April 7, 2000).

[14]  Plaintiff was complaining of worsening lower back pain, with numbness in his left leg and neck pain, that was not alleviated with Tylenol or Ibuprofen and only partially relieved by a heating pad. *Record* at 330.  He was given an injection of Toradol, and prescribed Naproxen and Flexeril.  *Id.* at 327. Torodal and Naproxen are nonsteroidal anti-inflammatory drugs, and Flexeril is a muscle relaxer.  *See www.medicinenet.com* (at /ketorolac-injection/article.htm; /naproxen/article.htm; and /cyclobenzaprine/article.htm).

In late April 2000, Plaintiff visited the hospital, again complaining of worsening back pain for the past four weeks and swelling in his feet for the past three weeks.  He had not taken his blood pressure medicine the previous day because he was "too busy" and had not checked his blood sugars for four months because he "ran out of chem strips."  *Id.* at 328.  His swollen feet were diagnosed as a result of "uncontrolled" hypertension.  *Id.* at 329.

that this back hurt when he moved, and that he had tingling in his feet "that has been there for a while." *Id.* at 326. He again was to consult an orthopedist. *See Record* at 324 (noting a "5-1-01 Ortho A"). Plaintiff would testify that he was "trying to get surgery done" in Texas, *id.* at 59, and he told his physician that he "saw ortho, they were of no help – did not get anything out of it – was told nothing was wrong with him," *id.* at 324. Yet, there are no records from an orthopedist during this time. In June 2001, when Plaintiff had multiple complaints including swelling and redness in his feet and pain in his legs, his doctor wanted to see the "ortho notes." *Id.* at 333. That never occurred, however, because Plaintiff then moved to Ohio, and there are no other records from this Texas hospital, except for an electrocardiogram ordered by an emergency room physician the following week. *See id.* at 337. In Ohio, Plaintiff was given Darvoset, which he reported controlled his pain, *e.g., id.* at 175, and then on December 5, 2001, the MRI showed a "small to moderate sized disc herniation at the level of L5-S1 toward the left, impinging on the dural sac and the left nerve root," *id.* at 148.

The MRI findings placed Plaintiff's back condition within the first two criteria of Listing 1.04(a), but those findings alone do not satisfy all the necessary criteria. *See supra* note 12. As noted at the outset, however, counsel does not suggest that the record before me is incomplete, nor does he argue that there is any other objective medical evidence predating the December 5, 2001 MRI diagnosing the requisite stenosis/disc disease and impingement. Therefore, ALJ Cole's determination that December 2001 is the earliest possible date to trigger the durational requirement is supported by substantial evidence.

There is a question whether Plaintiff would have fully recovered after the first surgery if he had completed physical therapy and had not experienced a fall. ALJ Cole's opinion touches on

this.[15]  As of late September 2002, however, Plaintiff's neurosurgeon noted that Plaintiff "has

experienced the recrudescense of pain," but did not attribute the new pain to a slip and fall

incident.  *Record* at 162.  His doctor recommended further tests, and a CT of lumbar spine

showed a "suggestion of a left paraspinal protruding disk at the L5-S1 disk space with

encroachment on the left L5 nerve root."  *Id.* at 146.  Plaintiff underwent the second surgery a

month later, on November 26, 2002.  The surgeon found scar tissue around the S1 nerve

structures, dissected it, and gave him a "generous diskectomy."  *Id.* at 254-56.

As of December 23, 2002, Plaintiff told the Ohio consulting examining psychologist that

he drinks six to seven shots of liquor "'every night'" to relieve his back and feet pain.  *Id.* at 268.

Yet the examiner observed that Plaintiff could walk without assistance, difficulty or pain and had

no problems sitting or getting out of a chair.  *Id.* at 269.  Plaintiff further told the examiner that he

watches television, goes to the store, and babysits for his daughter.  *Id.* at 271.  In late February

2003, Plaintiff's request for reconsideration states that his back pain was worse.  *Id.* at 134.

Significantly, however, there are no medical records after the November 2002 surgery, even

though Plaintiff remained in Ohio from November to May.

Not until some seven months after the November surgery did Plaintiff seek medical

treatment, one month after he moved to New Mexico.  At the first visit to a New Mexico doctor,

Plaintiff did complain of lower back spasms as well as headache, GERD, and cardiac symptoms.

---

[15]  *See Record* at 15.  Plaintiff missed more than half of his post-operative rehabilitation sessions
because he had to care for his three-year-old daughter.  *Id.* at 187.  Eight months after the first surgery, his
neurosurgeon observed that although Plaintiff's recovery was "initially slow," he "did experience good
reduction of his left lower extremity discomfort."  *Id.* at 162.

*Id.* at 307.  Subsequent visits, however, did not involve complaints about his back.[16]

Even if I assume that the first surgery did not alleviate the nerve compression, the second surgery did so, and it did so within a year of the December 2001 diagnosis.  Since nerve compression is the objective medical evidence that potentially brought Plaintiff's back problem within the Listing in the first instance, I conclude that ALJ Cole's duration finding is supported by substantial evidence.

## 2.  Severity By Equivalency

As I understand it, Plaintiff's contention that he met Listing 1.04(a) severity consists of two alternative components.  The first is based on his stenosis and resulting surgeries, discussed above, which do not meet the durational requirement.

With regard to the second component, Plaintiff first argues that ALJ Cole failed to consider whether a "combination" of his impairments was "equivalent"[17] to the Listing.  However, ALJ Cole specifically stated that he "compared Mr. Farr's severe ***impairments*** against" Listing 1.04 for spinal disorders and Listing 9.08A for diabetes with neuropathy, but "was not persuaded by the evidence submitted that Mr. Farr's ***impairments*** have reached listing level severity."  *Id.* at

---

[16]  *See, e.g., Record* at 304-05 (06/30/03 –  diabetes follow-up and wart on left thumb; back not mentioned in clinical impressions section); *id.* at 302 (07/03/03 –Medicaid Home and Community Based Assessment form does not list back problems and finds musculoskeletal system within normal limits, and as to activities of daily living, Plaintiff is mobile and can dress, eat, and care for his skin and other personal hygiene by himself, though he needs assistance in other areas such as housekeeping); *id.* at 300-01 (07/16/03 – cut on left heel due to stepping on edge of BBQ grill); *id.* at 298-99 (07/31/03 –  for follow-up on diabetes, feet are swollen and has a lot of pain); *id.* at 296-97 (08/28/03 – follow-up on diabetes and dyslipidemia; back normal, counseled on weight reduction and compliance with medications); *id.* at 292-95 (11/11/03 – visit complaining of two black-outs, dizziness, back pain, ankle pain, radiculopathy, shortness of breath, dry mouth; x-ray of left foot shows "no fractures or dislocations;" referred to a number of other doctors).

[17]  The "equivalence" analysis at Step 3 is likewise based solely on medical evidence.  *See, e.g.*, 20 C.F.R. § 404.1526(b).

18 (emphasis added).  Even though ALJ Cole's Listings analysis was brief, he did consider

Plaintiff's ***impairments*** "in combination."  In context, his reference to "severe impairments" refers

to **_all_** of Plaintiff's physical impairments that he previously discussed, including obesity.  The ALJ

further cited the applicable obesity ruling, finding "there is little question that obesity and

deconditioning increase the severity of Mr. Farr's other physical problems.  See SSR 02-1p

(2002)."  *Id.* at 17; *see also id.* at 18 & n.2.

        Plaintiff also contends that his syncope, diabetes and resulting peripheral neuropathy, and

obesity, when considered together, exacerbated his low back pain and caused numbness, tingling

and pain in his legs and feet from as early as 2000 through 2003.  He thus contends that all of his

impairments taken together were "equivalent" to Listing 1.04(a) for a period well longer than one

year.  *See Doc. 9* at 9-10, 12-13; *Doc. 11* at 1-4.  I disagree.

        First, even though ALJ Cole could have been more precise in his reasoning, I do not find

his Listings determinations "conclusory," because he reached them after a comprehensive and

lengthy discussion of the evidence and after identifying the relevant listings and ruling.[18]  Second,

---

[18]     In *Clifton,* a panel of this court reversed the district court and remanded
the case for additional proceedings when the ALJ made 'such a bare
conclusion' that it was effectively 'beyond meaningful judicial review.'. . .
 However, as we explained then, our decision was based on the fact that
'the ALJ did not discuss the evidence or his reasons for determining that
appellant was not disabled at step three, or even identify the relevant
Listing or Listings; he merely stated a summary conclusion that
appellant's impairments did not meet or equal any Listed Impairment.'. . .
This is not the case before us now.  Here, the ALJ went to great lengths to
identify the relevant listings, discuss the evidence (including objective
medical reports that discounted the severity of Mrs. Corber's
impairments) and follow the appropriate procedure for documenting the
Psychiatric Review Technique Form ratings.  These findings are far from
the type of summary conclusion we rejected in *Clifton,* and, therefore, are
not beyond any meaningful judicial review.

and more importantly, the "equivalency" rationale cannot be used as an alternative basis for satisfying Step 3 when a Listing specifically addresses the condition.

> For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to ***all the criteria*** for the one most similar listed impairment. . . . *A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment.*

*Sullivan v. Zebley,* 493 U.S. 521, 531 (1990) (emphasis added).  If a claimant does not meet the Listing, he cannot rely on "equivalency" no matter how severe the combined effect of his impairments.[19]  The ruling that requires ALJs to consider the effects of obesity at Step 3 does not change this framework.[20]

Here, Plaintiff does not challenge the conclusion that his neuropathy fails to meet the diabetes Listing.  He focuses exclusively on Listing 1.04(a) which, as discussed above, he did not meet for the requisite duration.  Furthermore, his syncope and neuropathy and obesity do not

---

*Corber v. Massanari,* 20 Fed. Appx. 816, 819 (10th Cir. 2001).

[19]  *Zebley,* for example, cited the situation where a mentally handicapped child has IQ and growth impairment conditions just shy of the Listings criteria, and observed that the child "cannot qualify for benefits under the 'equivalence' analysis--no matter how devastating the combined impact of mental retardation and impaired physical growth.").  493 U.S. at , n. 11.  *See also Brainard v. Secretary of Health & Human Servs.,* 1994 WL 170783 at * 2 (10th Cir. 1994) ("A claimant is considered disabled when he or she has an unlisted impairment or combination of impairments for which there are medical findings equal in severity to the criteria for the closest listed impairment. . . .  Here, however, Mr. Brainard claims to suffer from a listed impairment, but simply does not meet the listing's criteria") (citations omitted); *Hardesty v. Barnhart,* CIV 03-1114 KBM (*Doc. 15* at 14-15 and cases cited therein).

[20]  *Social Security Ruling 02-1P,* 2000 WL 628049 at *5 (9/12/02) (We will also find equivalence if an individual has multiple impairments, including obesity, none of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.").

satisfy **_all_** of the criteria of Listing 1.04(a).  Indeed, Plaintiff does not explain how he meets each

of the criteria.  Thus, I find Plaintiff's Step 3 arguments to be without merit.

### E.  Residual Functional Capacity & Credibility

ALJ Cole found that Plaintiff has the residual functional capacity to perform sedentary

work with certain limitations.  His reasons for that conclusion are as follows:

> In assessing Mr. Farr's residual functional capacity, I have
> considered his statements of record concerning his symptoms,
> including pain, and the extent to which these symptoms can
> reasonably be accepted as consistent with the objective medical
> evidence. . . .  As discussed above, there are many inconsistencies
> in this record, which suggest that Mr. Farr's claims concerning his
> ability to work are not wholly credible.  There is also evidence that
> Mr. Farr has consistently failed to comply with the treatment
> recommendations made by his health care providers. . . .  Also, I
> find that the many specialists who have evaluated Mr. Farr for his
> various medical problems appear to be unaware of the other
> problems that he has alleged that prevent him from working. . . .
> Finally, I note that, although Mr. Farr described much more
> restricted activities of daily living in his testimony in April 2004
> than he had in November 2003, *at no time during these*
> *proceedings has Mr. Farr described such severe restrictions on*
> *his activities as to preclude all work.  In spite of his claims*
> *concerning his symptoms, Mr. Farr has only identified*
> *limitations on his ability to walk and stand for prolonged periods*
> *of time and his ability to lift heavy objects.*  I find only one
> reference to a limitation on his ability to sit in the case file.  The
> first time he described significant limitations on his ability to use his
> hands was at the second part of the hearing in this matter.  In
> contrast, at the first part of the hearing, he testified that he engaged
> in several activities that require full use of his hands.
>
> In assessing Mr. Farr's residual functional capacity, I have also
> considered medical opinions in the record, which reflect judgments
> of his doctors and therapist about the nature and severity of his
> impairments resulting in limitations. . . .  Unfortunately, however, *I*
> *find only the restrictions Mr. Farr's doctors put on his physical*
> *activities during the time between his two back surgeries.*  I have,
> however, also given careful consideration to the opinions expressed

> by examining consultants and the medical experts who reviewed
> Mr. Farr's records for the Administration during these proceedings.
> . . .
>
> Based upon careful review of all of the evidence of record, I find
> that, throughout the period under review, Mr. Farr has had the
> residual functional capacity for a range of at least sedentary work . .
> . .  ***Although I find no evidence to support Mr. Farr's assertion
> that he is limited in his ability to sit, I find that he is limited to
> jobs that  will allow him to sit or stand at his option.***  Mr. Farr has
> also alleged that the has difficulty using his hands, but the evidence
> of record, including Mr. Farr's testimony in November 2003, is to
> the contrary.  Mr. Farr's residual back problems prevent him from
> performing jobs that require more than occasional climbing,
> balancing, stooping, kneeling, crouching, or crawling.

*Record* at 18-19 (citations and regulation definitions omitted) (emphasis added).

Plaintiff raises numerous arguments regarding ALJ Cole's credibility determination, some of which are directed to the reasoning quoted above.  For the reasons stated by the Commissioner in her response, I agree that these arguments take phrases out of context and are also without merit.  I add the following observations.

Plaintiff focuses on part of the findings a neurologist made in December 2003 and January 2004 -- the absence of reflexes.  *See Doc. 9* at 15.  He neglects to mention the neurologist's other findings -- that Plaintiff has a motor strength of 5/5 in both upper and lower extremities and "should quit smoking and drinking alcohol and stay on his diabetic diet."  This doctor did not mention or impose any limitations on Plaintiff.  *Record* at 320; *see also id.* at 318.

Plaintiff cites to *Teter v. Hecker,* 775 F.2d 1104 (10th Cir. 1985) and its discussion of the four elements the ALJ must consider before denying benefits based on a failure to follow prescribed treatment.  His reliance on *Teter* is misplaced.  *See Doc. 9* at 18.  ALJ Cole did not

deny benefits on that basis.[21]  *See* 20 C.F.R. § 404.1530.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 8)* is DENIED, and the

decision of the Commissioner is affirmed.  A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

---

[21]  Insofar as his contention could be based on an inability to afford treatment, I already
discussed the indigency portion of this contention above.

19